

ATTORNEYS AT LAW

3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
Tel: (215) 639-0801
Fax: (215) 639-4970
cburke@karpf-law.com

January 15, 2019

**SENT VIA ECF & E-MAIL**

The Honorable Tonianne J. Bongiovanni
U.S. District Court for the District of New Jersey
Clarkson S. Fischer Federal Bldg. & U.S. Courthouse
402 East State Street, Room 6052
Trenton, NJ 08608

**Re:** ***Arevalo et al. v. Seldat Distribution, Inc. et al.***
**Case No.: 16-712**

Dear Judge Bongiovanni:

I represent the Plaintiffs in the above-referenced matter. This FLSA case *wherein* the Plaintiffs are suing for unpaid overtime compensation and alleging unlawful retaliatory terminations. There are five (5) female Plaintiffs total, each of whom worked for Seldat during the years 2014 and 2015 (with varying periods of employment) –all in a Human Resources capacity. Four (4) out of the five (5) Plaintiffs were terminated by Individual Defendant Daniel Dadoun (Seldat's owner) on the exact same day: October 15, 2015 (shortly after Plaintiff Vilma Arevalo submitted a formal complaint to the Department of Labor "DOL" and asked the remaining Plaintiffs to assist her in gathering documents for the DOL's investigation into Seldat's improper payment of employee wages).

In addition to their retaliatory terminations for participating in a lawful DOL investigation – all five (5) Plaintiffs are suing for unpaid overtime. Despite Seldat's time records produced, the Plaintiffs also worked hours that were not properly logged by Mr. Dadoun and it was his prerogative on occasion to pay a mere $1.00 extra for Saturday work (vs. time and ½). The sole method for retrieval of these additional hours worked is via Defendant Seldat's internal emails (as the Plaintiffs would email Arevalo and/or Dadoun their additional time worked during the week and computation of Saturday hours work). The need for the discovery of ESI in this matter is not inconsequential, but rather, material to the Plaintiffs' ability to establish their actual hours worked, disputes pertaining to their actual job duties (as Dadoun will not concede they were non-exempt) and the true bases for their respective terminations.





Literally, the week following their October 2015 terminations, Mr. Dadoun filed a civil lawsuit in the New Jersey Superior Court asserting a slew of state claims *against all five (5) Plaintiffs* (presumably in anticipation of their own wrongful termination suits in federal court for having reported his illegal pay practices to the DOL).[1] *See* Exhibit A, attached hereto.

As can be gleaned from Mr. Dadoun's state court complaint, he asserts a number of improprieties pertaining to the Plaintiffs in connection with their separation (including *why* they were separtaed[2]), alleging theft of employee files, theft of customer files, misappropriation of confidential information regarding Seldat's customers and employee files, and that Plaintiff Vilma Arevalo, in concert with the other named Plaintiffs stole or embezzled monies from the company. *Id.* This Court may take judicial notice that Mr. Dadoun had an obligation to preserve ESI as of the date of this state court filing *or earlier* *when he reasonably knew that litigation was probable*.[3]

Even if this Court were to assume Mr. Dadoun had no obligation to preserve electronic or paper evidence pertaining to these Plaintiffs and the circumstances surrounding their separations for the state court matter (which defies New Jersey law), the Federal Complaint in this matter was filed only three (3) months later on February 9, 2016. Exhibit B. The attorney who submitted the Answer to the instant federal matter was the *same counsel* representing Mr. Dadoun in connection with the state case filed against these same Plaintiffs. Dkt. No.: 7 (Seldat's Answer was filed April 1, 2016).

In addition to the other items directly at issue as outstanding ESI discovery (discussed *infra*), Plaintiffs request that Mr. Dadoun produce any litigation hold letters provided to him by any prior and current attorneys representing him. Based upon his admission that he has engaged in systematic destruction of emails on his internal servers and deleted or destroyed numerous computers during the entire course of this litigation, without regard for his obligations under Rule 37(e),[4] the litigation hold letters are squarely discoverable. "Although, in general, litigation hold letters are privileged, courts have adopted the view that when spoliation occurs those letters become discoverable." *Major Tours, Inc. v. Colorel*, No. 05-3091(JBS/JS), 2009 U.S. Dist. LEXIS 68128, at *7-8 (D.N.J. Aug. 4, 2009) *See Keir v. Unumprovident Corp.,* No. 02-CV-8781(DLC), 2003 U.S. Dist. LEXIS 14522, 2003 WL 21997747 at *6 (S.D.N.Y. Aug. 22, 2003)(allowing detailed

---

[1] Each of the Plaintiffs are still defending this state case, which is scheduled for a jury trial in the next two (2) months.

[2] **Which is directly relevant to this federal action for wrongful termination, and the bases he asserts for their separations *herein*. Mr Dadoun – who is *not* an attorney has repeatedly stated in his depositions in this case that he believes one suit has nothing to do with the other. That is not his decision to make.**

[3] As the standard is no different in the State of New Jersey than in this federal District Court. "A duty to preserve arises where there is: (1) pending or probable litigation involving the defendants; (2) knowledge by the plaintiff of the existence or likelihood of litigation." *Aetna Life & Cas. Co. v. Imet Mason Contractor*s, 309 N.J. Super. 358, 366, 707 A.2d 180, 184 (Super. Ct. App. Div. 1998).

[4] Rule 37(e) specifically pertains to the preservation of ESI, and the sanctions available for a party's failures in this regard.





analysis of emails pertaining to defendant's preservation efforts after finding that electronic records which had been ordered preserved had been erased). *See also Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 425 nn.15-16 (S.D.N.Y. 2004) (*"Zubulake V"*)(disclosing the details of counsel's litigation communication after discovering that at least one e-mail had never been produced); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 634 (D. Colo. 2007)(permitting plaintiff to take a Rule 30(b)(6) deposition to explore the procedures defendants' counsel took "to identify, preserve and produce responsive documents" after finding that defendants expunged the hard drives of several former employees after the present litigation had began)."These cases, although specific to whether litigation hold letters are discoverable, recognize a growing trend of waiver of privilege to require production of documents where spoliation has occurred." Magnetar Techs. Corp. v. Six Flags Theme Park Inc., 886 F. Supp. 2d 466, 482 (D. Del. 2012).

The duty to preserve evidence arises when a party is in possession of evidence "knows or reasonably should know that litigation is pending or probable." *See Goldrich v. City of Jersey City*, 2018 U.S. Dist. LEXIS 162044, at 24-25 (D.N.J. July 25, 2018) (citing *State Nat'l Ins. Co. v. Cty. of Camden*, 2011 U.S. Dist. LEXIS 164093, at 3 (D.N.J. June 30, 2011)). Same is extended to the preservation of **electronically stored information**. *See Goldrich v. City of Jersey City*, 2018 U.S. Dist. LEXIS 162044, at 25-26 (D.N.J. July 25, 2018) (emphasis added) ([A party's] duty to preserve evidence requires that he take reasonable affirmative steps such as backing up the ESI on an external device or in a separate, secure location. *See also Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 428 (W.D.N.Y. 2017) ("Courts routinely hold that a party's discovery obligations include taking affirmative steps to ensure that all potentially relevant evidence is retained.") (internal quotations omitted); *Feist v. Paxfire, Inc.*, 2016 U.S. Dist. LEXIS 116405, at 14 (S.D.N.Y. 2016) (awarding sanctions for, *inter alia*, plaintiff's failure to backup her computer before it crashed)).

Plaintiff discusses *infra* at Section II, Mr. Dadoun's clear testimony regarding the fact that he regularly deletes emails and has since the inception of this case without regard for the ramifications it would have on Plaintiffs' ability to discover material emails tending to refute many of his allegations surrouding his knowledge of the DOL investigation and the reasons for Plaintiffs' separations.

The entire reason Mr. Dadoun was subject to a *second* court ordered deposition was to explore a.) why it was that he testified with some certaintiy he had numerous outstanding documents related to this case, which he later claimed in a conclusory affidaivt he could not locate, and b.) what efforts he undertook to *actually* search for or presrve any documents in this case. *See* Docket No.: 45.

**Refusals to Provide Information Pertaining to his ESI search efforts:**

To put it mildly, Mr. Dadoun was obstreperous during both of his depositons, and wanted the undersigned to cease qusetioning him about the actual efforts he undertook to look for documentation and be content with his vagueries and avoidance tactics. While the undersigned recognizes the Court's time is precious, reading his second deposition in its entirety is illuminiating to his behavior in this case. For ease of reference, however, the undersigned





merely inserts *herein* the "highlights" of some of the more egregious areas in his deposition reflecting refusals to provide information related to his "elaborate" ESI search.

After attempting to give several pages of a narrative testimony as to why he believed he was sitting in this second deposition and presumably hoping to avoid further questioning on his search efforts, he was instructed as follows.

> **Q: . . . . The reason that we are here today is to find out what you did to look for those documents. And If you don't tell me, the Judge will issue a Court Order compelling you to identify what you did to look for the documents.**
>
> A. Please do.

Exhibit C[5], at p. 228:2-8. Thereafter, he repeatedly declined to answer material questions pertaining to ESI and actually invited the Court to intervene. *Infra*.

Mr. Dadoun started the deposition out by providing a vague unsolicited narrative about how he spent *more than 200 hours* looking for the documents which formed the basis for the second deposition. Ex. C, at p. 226:22-227:20. When he was then asked how many days he acutally spent peforming this (allegedly time consuming exercise), he testified he need not go into "the details," and "I'm not going to answer that question." *Id.* When asked what exactly he physically did to go and look for the documents which were identified as existing during his first deposition, he testified as follows:

> "Its very simple what I did. I went and reviewed emails, attachments, search the servers, talked to differnet people. I'm not going to put – scratch talk to people becuase after that, its going to bite me back at the end. I looked to everything that was possible in my power to find the document, and thats it. And I did not – whatever I had, I compiled it . . . .and I brought it."

Ex. C., at p. 230:13-231:2. (He brought nothing, as he simply provided an affiavit saying he couldnt find anything).

Given that Mr. Dadoun volunteered that he reviewed emails, the next natural inquiry is *what email custodians* he may have actually reviewed/searched. In response to a question on that point, he refused to answer:

> Q: The email that you have here [referring to an exhibit], Daniel@seldatinc.com, do you use that email for all business purposes or **do you have another email that you use to speak with customers, vendors and employees**?
>
> A: Okay, I'm not going to answer you in the easy way, yes, this is not the way – the way I manage my business has nothing to do with this court. And to answer,

[5] Dadoun Deposition Vol. II attached hereto as Exhibit C.





> the way my email, if I do have noe email or 20 email has nothing to do with this court. This is the email that was sent thorugh Arevalo. If I have 20 emails, I can do, that's nothing to do with the court.
>
> Q: I strongly disagree with you.
>
> A: That's okay, you can have the Judge do differently. I'm not going to answer the question. That is – how I'm going to answer the question. This is – how I'm going to tell you if I have a company like that and I'm using different email, this is to try to corner me in a point that I'm not going to answer.
>
> . . . . .
>
> Q: Just to be clear, during the time that [Plaintiff] Vilma Arevalo and the other named plaintiffs worked for Seldat, you will not tell me whether or not you had any other emails that you were using for company business, correct?
>
> A: Correct.

Ex. C. at pp. 234:235-18; 237:7-12 (emphasis added). Contrary to Mr. Dadoun's position, whether or not he used more than one email in 2014 and 2015 or thereafter to communicate regarding Plaintiffs' duties, hours worked, with the Department of Labor, or respecting the reasons for the Plaintiffs' separations – *are* discoverable --- particularly where Mr. Dadoun has come up short in the ESI department in complying with his obligations in discovery.

Mr. Dadoun was asked to identify if he provided his passwords to anyone at Seldat (so that the undersigned could ask follow up questions pertaining to any defenses he may have respecting spoliation), but he would not even indulge. Instead, the questioning pursued with his refusals as follows:

> Q. Did you give your password out to theemployees at Seldat?
>
> A. First of all, I'm not answering that question, and the second thing is, very simple, yes, my email –
>
> Q. Is private, right?
>
> A. It's not about just private. If I have IT that sometimes can't get acces sometimes to my email and after the password has been changed has nothing to do with you. You're going to at the end try to corner me in the point that it's not valid. As you go to make sure to hear, again, on that question, because it's not the way I'm conducting the business, I'm not a lower level employee that does the business. If, example, somebody had at one point or didn't have at one point my password is not irrelevant (sic) to this thing, because you're trying now to try and to corner me to get an answer for something you're never going to get an answer from me. I





will not answer the question because it's very convoluted and it doesn't bring anything to do case.

**Q. It is not your job to determine –**

A. That's okay.

Q. Hold on.

A. For me, this is the way I'm looking at it.

Q. Please stop interrupting me. I would like to say something. It is not your job in this case to determine what's relevant and what's irrelevant. That is what you have an attorney here for.

A. That's okay.

Q. My question to you is very simple, and again, if you're not going to answer it, thats fine. Did you give your password to Daniel@seldatinc.com out to other employees at Seldat?

A: I'm not going to answer the question. What was your following question? . . . .

Q: I can't ask my questions because now you wont answer my foudnational questions, so I'm going to have to bring you back here and get the Judge to rule every time you wont answer my questions.

Exhibit C., at pp. 239:11-241:13.

Mr. Dadoun contends in his state case that the Plaintiffs deleted electronic records, stole computers and the like – and in his first deposition, he has attempted to justify his failure to produce documents in this federal case by claiming the *plaintiffs* caused the deprivation of his abiltiy to produce ESI. However, he testified during this second deposition that not a single plaintiff had the password to his emails.[6] Therefore, if any of his emails were deleted, it would not have been at the doing of the plaintiffs, as they never had access to his passwords. Even as a non-tech savvy person, the undersigned knows full and well that if a computer is destoryed or informtion remove therefrom, it will not otherwise impact one's ability to access a personal or work email, such as gmail and the like from a different computer device. Frankly, Plaintiff had no obligation to indulge Mr. Dadound's refusals to answer questions pertaining to his reviews on relevancy.

[6] Ex. C, at pp. 248:2-11.





When Mr. Dadoun argued it was private and confidential if he has other work emails or has shared his passwords with others, the undersigned assured that same could be dealt with via a confidentiality agreement, which did not satiate him.

To date, Mr. Dadoun has declined to identify a.) who performed the requisite search for ESI[7]; b.) what email addresses he actually used during the time in qusetion and what email addresses he actually searched; b.) what computers he searched; c.) what internal online systems or servers he searched.

The undersigned asked him why it was that he was able to selectively provide some emails in this case from February and June of 2015 (i.e. only a few that support Seldat's defense), but no other emails - and he repeatedly stated that everything is done "on the back end." When the undsigned then asked about the "back end," and under what circumstances emails are archived or deleted, he declined to answer as follows:

> Q. When I asked you though why it is that you are able to produce some emails dating back to February or June of 2015 but you can't give me the third page of DD-1, you gave a very long narrative but you said that there is script that is done on the back end. What does that mean?
>
> A. Okay, I'm going to make sure that you understand. We archive or deletes emails that are irrelevant because we have a lot of emails. We do pay for storage, and by the way, there's a script that run on the back end to delete or store email that was done. That email was never stored neither -- it was not archived. It was apparently deleted. When it was deleted, I have no idea. Okay? But it wa deleted in a certain time by the script whe you run it. And we have emails, by the way that are relevant that are saved from 2010 example, yes.
>
> Q. What is the reason you believe that you were able to produce this? Was it archived? Was it saved or –
>
> A. It was archived, it was archived.
>
> Q. Archived where?
>
> A. Okay, you know what, do you want me to give you a teaching about how computer works? It's archived in one of our servers. How it's done, it will take me a long time. My background -- it doesn't matter. It's done on the back end.
>
> Q. Did you personally archive DD-2?

---

[7] Mr. Dadoun repeatedly testified "we" searched and then rectanted to "I searched" (admitting under oath that he refuses to bring anyone else into this dispute, *even if* someone else in fact assisted him in this endeavor). Ex. C., at pp. 230:13-231:2





A. No, it's the back end that does it. We have –

Q. Who is the back end?

A. I have about close to 400 engineers that do the majority of the IT and all of it. This is what their job. How they done it and everything, you maybe want to produce all my team to know how it was. But I don't think George will allow it, especially –

Q. I will do what's called a 30(b)(6) deposition to speak on behalf of the entire I team to answer my questions.

A. No problem.

[However, he later volunteered to taunt the undersigned]

"Theres nobody, by the way, in the company that will do it, becuase the bottom line, the people that odes it, some of them are sitting in Vietnam, some of them are sitting in Israel."

Q: We'll do it by telephone or Skype then.

A: You can do whatever it is. They are 12 hours difference.

Ex. C, at pp. 250:14-254:8.

**Proof of Blatant Failure to Preserve:**

Due to brevity, Plaintiffs now move on to his concessions regarding systematic deletion of emails in violation of FRCP 37(e).

Mr. Dadoun testified that he "archives or deleted emails" that *he* believes are irrelevant and that there is also a "script" that runs on the back end to delete or store certain email. Exhibit C at pp.250-14-251-9. He further testified that the "script" works every day and deletes emails, and when asked if he *ever* told his IT team to stop deleting emails he responded "no, never going – why they do that?" *Id.* at pp. 254:17-255-4.

Q. **Has there ever been a point in time where you went to your IT team and said stop deleting emails every day**?

A. No, never going -- why they do that? They do that the way it should be. This is their job. By the way, even though when you have emails yourself on your that personal email, sometimes archive will delete it, old emails.

Ex. C, at p. 255:1-9.





"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'ligation hold' to ensure the preservation of relevant documents." *Major Tours. Inc. v. Colorel,* 2009 U.S. Dist. LEXIS 68128, *9 (D.N.J. Aug. 4, 2009)(quoting *Zubulake v. UBS Warburg* LLC, 220 F.R.D. 212, 218 (S.D.N.Y.Oct. 23, 2003)); *see Arteria Prop. Pty Ltd. v. Universal Funding V.T.O.*, 2008 U.S. Dist. LEXIS 77199, *14 (D.N.J. Oct. 1, 2008). "However, a party's discovery obligations do not end with the implementation of a litigation hold." Id. (citing *Zubulake,* 229 F.R.D. at 432). "Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce relevant documents." *Id.*

**Mr. Dadoun's approach in this case is to generally state without any supporting details, that he searched everything – and he has nothing to provide, and anything he thought may be relevant has been deleted and – story over**.

This is not permissible under the rules of discovery and corresponding jurisprudence.[8] Even deleted computer files, whether e-mails or otherwise, are discoverable. *See Wells v. Xpedx*, 2007 U.S. Dist. LEXIS 29610, 2007 WL 12000955, * 1-2 (M.D. Fla. April 23, 2007) ("producing party has the obligation to search available electronic systems for deleted emails and files") (citing to Advisory Committee Notes, Fed. R. Civ. P. 34) (internal citations omitted); *see, e.g., Antioch Co. v. Scrapbook Borders, Inc.*, 210 F.R.D. 645, 652 (D. Minn. 2002) (citing *Rowe Entertainment, Inc. v. The William Morris Agency, Inc.,* 205 F.R.D. 421, 427, 431 (S.D.N.Y. 2002); *Simon Property Group, L.P. v. MySimon, Inc.,* 194 F.R.D. 639, 640 (S.D. Ind. 2000); *Playboy Enterprises, Inc. v. Welles,* 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999) (other citations omitted).

Each Plaintiff has been deposed in this case and several testified that in addition to any actual time clock entries, they routinely *emailed* their hours and Saturdays worked directly to Plaintiff Arevalo[9] and Defendant Dadoun. **Email was a regular form of communication between Plaintiffs with one another and Mr. Dadoun respecting their job duties, hours worked and memorialization of employee concerns**. The concern over Mr. Dadoun's spoliation actions are not based upon a "fishing expedition" for emails that don't exist. This man traveled on a relatively frequent basis (which is why he allegedly can never appear for a deposition in this case), and therefore, his use of emails was quite significant as he was not physically at the Seldat warehouse every day. The DOL Complaint and notices thereof were sent to Mr. Dadoun via email as well.

Plaintiffs respectfully request that Dadoun i.) produce the outstanding documents he testified to during his second deposition (as outlined *infra*) and ii.) a Court Order compelling an

---

[8] The basis for Mr. Dadoun's *second* court ordered deposition, was due to his testimony in his first deposition, where he averred with some certainty that he posessed numerous documents which were purportedly benefical to his defenses in this case. Months later, and after threatening a motion to compel, he simply responded that he "does not have" the documents requested in the August 23, 2018 letter.

[9] Plaintiff Arevalo's most recent position with Defendant Seldat was as the Human Resources Manager. Prior to that promotion, she worked in a non-exempt role and was at all times entitled to overtime.





independent forensic examination of active online data on Seldat's internal email server to retrieve relevant and responsive documents and assess whether Dadoun has intentionally deleted responsive and relevant electronically stored information ("ESI"). The mere fact that Mr. Dadoun has *never once* put a litigation hold in place and presumably deleted any relevant ESI in this case --- does not mean he should benefit from his unfair conduct without repercussions.

Courts have allowed forensic examination of electronic devices where the party's discovery responses contain "discrepancies or inconsistencies," including a failure to produce responsive documents and/or evidence that relevant data has been deleted. *See Genworth Fin. Wealth Mgmt., Inc. v. McMullan*, 267 F.R.D. 443, 447-448 (D. Conn. 2010) (forensic examination allowed, based, in part upon Defendant's admission to spoliating evidence by discarding computer); *U & I Corp. v. Advanced Medical Design, Inc.*, 251 F.R.D. 667, 676-77 (M.D. Fla. 2008) (authorized use of independent computer expert to sample information on hard drives for responsive information); *see e.g., Antioch Co.*, 210 F.R.D. at 652-53(setting forth procedure for independent expert to "mirror image" party's hard drive to retrieve deleted files, as set forth in *Playboy Enterprises, Inc.*, 60 F. Supp. 2d at 1054-55); *Simon Prop. Grp. Ltd. P'ship v. MySimon, Inc*., 194 F.R.D. 639, 641 (S.D. Ind. 2000) (following basic structure for an independent expert paid by party requesting information to "mirror image" other party's hard drives to identify deleted files, and following procedure set forth in *Playboy Enterprises, Inc.)*

Further, where it is the party *necessitating* this exercise in the first instance, becuase of a willful failure to preserve, federal courts routinely shift the costs of doing so to the party who should have produced same in the first instance (without the need for this costly forensic exercise). *See e.g. Telequest International Corp. v. Dedicated Business Systems, Inc.*, No. 06-5359, 2009 U.S. Dist. LEXIS 19546, at *16 (D.N.J. Mar. 11, 2009) (awarding compensatory monetary sanctions for the destruction of relevant e-mails); *Stream Cos. v. Windward Advert*., No. 12-cv-4549, 2013 U.S. Dist. LEXIS 100319, at *19-20 (E.D. Pa. July 17, 2013)(This Court finds that monetary sanctions are appropriate to compensate Stream for the attorney fees incurred in filing the instant motion, as well as the attorneys' fees and any other costs incurred in attempts to obtain the destroyed emails.); *Square D Co. v. Scott Elec. Co*., Civil Action No. 06-00459, 2008 U.S. Dist. LEXIS 36099, at *5 (W.D. Pa. Apr. 30, 2008)(affirming prior order that Defendant globe shall bear all costs related to the forensic inspection)*; In re Linerboard Antitrust Litig*., No. MDL No. 1261, 2012 U.S. Dist. LEXIS 99001, at *110-11 (E.D. Pa. July 16, 2012)(Court concludes that appointing IT Acceleration at Peoples's expense is appropriate to remedy); *Cf. Floorgraphics Inc. v. News Am. Mktg. In-Store Servs.*, 434 Fed. Appx. 109 (3d Cir. 2011) (finding no willfulness by distinguishing from cases where the parties response misled movant into thinking there was nothing else responsive).

Plaintiffs would be fully permitted to seek their attorneys' fees expended in unnecessarily having to take Mr. Dadoun's second deposition (most of which time he spent refusing to answer or being argumentative) and having to pursue the instant briefing. However, they just want to obtain the ESI disocvery they are rightfully entitled to and cure the egregious deletions caused by Mr. Dadoun's failure to abide by the Federal Rules.

The fact that Dadoun *may or may not* be saavy at litigation[10] "does not give Defendants a pass for discovery violations, especially given the fact that they have had the benefit of counsel throughout this litigation." *Windward Advert*, at *25 citing *Mahoney v. Yamaha Motor Corp. U.S.A.*, No. 11-5538, 290 F.R.D. 363, 2013 U.S. Dist. LEXIS 38741, *27 (E.D.N.Y. Mar. 19, 2013) (rejecting inexperience as an excuse to avoid sanctions). Nowhere in the Order, and at no time thereafter, were Defendants given permission to withhold devices from production that they unilaterally determined did not contain relevant, discoverable information. *See Smith v. Life Investors Ins. Co.*, No. 07-681, 2009 U.S. Dist. LEXIS 112241 (W.D. Pa. Dec. 3, 2009) (rejecting argument that non-production of devices was because of erroneous interpretation of their relevance as "entirely without merit").

An Independent Forensic review company may very well determine that the purported exhuastive search made by Mr. Dadoun was not had at all, and that in fact, there are substantial accessible emails on the active online server directly related to the allegations and defenses in this case. "Accessible data must be produced at the cost of the producing party; cost-shifting does not even become a possibility unless there is first a showing of inaccessibility." *Peskoff v. Faber*, 244 F.R.D. 54, 62 (D.D.C.2007). Therefore, "it cannot be argued that a party should ever be relieved of its obligation to produce accessible data merely because it may take time and effort to find what is necessary." *Id. See also Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284 (S.D.N.Y.2003) ("It is worth emphasizing again that cost-shifting is potentially appropriate only when inaccessible data is sought.")

Mr. Dadoun testified in his first deposition that he has "backup[s] of everything" even though he did not have the actual computers that the Plaintiffs used – since the server (the backup system) was where the actual data was stored. Exhibit D[11], at pp. 34:13-19, 35:1-2, 12-14, 38:5-11. When asked where the server is actually located he could "not recall" but would ask his IT team where it was located. *Id.* at p.44:15-22. Plaintiffs have yet to receive this information.

Dadoun's testimony makes it very clear that he has made no efforts to preserve documents relevant to this case, and he cherry picks which emails are "irrelevant" – as in not helpful to him – and simply deleted them. Plaintiffs are entitled to a forensic examination of Mr. Dadoun's server to determine which documents have been deleted. Mr. Dadoun's deletion of relevant evidence is also evidence of spoliation. Spoliation usually refers to the alteration or destruction of evidence. "[D]eleting files can constitute spoliation of evidence." *Arteria Prop. Pty Ltd. v. Universal Funding V.T.O.*, 2008 U.S. Dist. LEXIS 77199, *14 (D.N.J. Oct. 1, 2008); *and see First Senior Fin. Grp. LLC v. Watchdog*, 2014 U.S. Dist. LEXIS 45952, at 11-12 (E.D. Pa. 2014) (citing *Bull v. United Parcel Serv.*, 665 F.3d 68, 73 (3d Cir. 2012)). However, "the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him." *Id.* (citing *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 96, 19 V.I.

[10] A simple review of Mr. Dadoun on the world wide web reveals this is most certainly not his first go round in federal or state litigation.

[11] Dadoun Deposition Vol. I attached hereto as Exhibit D.





642 (3d Cir. 1983)). Thus, because a party's failure to produce a document can have the same practical effect as destroying it, failure to produce evidence can, in certain circumstances, be characterized as spoliation.[12] *Id.*

After two (2) obstructive depositions, multiple follow up requests for supplmentation, it is Mr. Dadoun's position that if we "want to have more documents to be produced, you can use the Court to have it." Exhibit D at p.328:13-14. Whether Mr. Dadoun is in possession of responsive documentation and has chosen not to turn them over or he has destroyed relevant evidence, Mr. Dadoun has, nevertheless violated the Federal Rules.

**Outstanding Discovery (as testified to as his last deposition):**

- Physical copies of Bank of America checks or bank records reflecting bonuses given to Plaintiff Arevalo. Exhibit D at pp. 330:14-331:13

- All Plaintiffs' W-2s or 1099s issued during their employment with Seldat or after their separation therefrom. *Id.* at pp. 331: 14-24, 333:15-21.

- List of employees who purportedly left Seldat because of the Plaintiffs. *Id.* at pp. 336:23-337:6.

- Defendants' IT contact information and/or contact person (presumably who can sit for a 30(B)(6) Deposition in this case). *Id.* at p. 252:15-19.

- Plaintiff Arevalo's clock in and clock out/ time records. *Id.* at pp.354:7-16, 355:16-23.

- All DOL attachments referenced to in the September 30, 2015 email to Dadoun. *Id.* at p. 380:4-11.

- Documentation that shows Plaintiff Arevalo was an "officer" of Defendants' company in the United States. *Id.* at p.298:1-11.

- Documentation reflecting that Plaintiff Arevalo was removed as a Seldat corporate officer or representative pertaining to Defendants' Columbia location(s). *Id.* at p.302:1-18.

---

[12] Spoliation occurs when (a) the evidence was in the party's control, (b) the evidence is relevant to the claims or defenses in the case, (c) there has been actual suppression or witholding of evidence, and (d) the duty to preserve the evidence was reasonably foreseeable to the party. *First Senior Fin. Grp. LLC*, 2014 U.S. Dist. LEXIS 45952, at 12 (citing *Brewer v. Quaker State Oil Ref. Corp*., 72 F.3d 326, 334 (3d Cir. 1995)). The party asserting that spoliation of evidence has taken place carries the burden of proof. *Id.* (citing *Stream Cos., Inc. v. Windward Adver*., 2013 U.S. Dist. LEXIS 100319, 2013 WL 376121 at 2 (E.D. Pa. 2013); Tabon v. University of Pennsylvania Health System, 10-cv-2781, 2012 U.S. Dist. LEXIS 101049, 2012 WL 2953216 at 2 (E.D. Pa. 2012)).

KARPF, KARPF & CERUTTI, P.C.

ATTORNEYS AT LAW

- The number of companies Defendants own that are located in Columbia. *Id.* at p. 290:13-291:6.

- Bank of America statements pertaining the amount of money disbursed to all Plaintiffs and Defendants' payroll employees which Mr. Dadoun claims are the only substantive documents which he would have used to complie the excelt spreadsheets he created in litigatino relfecting purported monies stolen by Plaintiffs. *Id.* at pp. 266: 20-267:-17, 268:1-3, 389:2-16. It should be noted that Defendants presumably intends to use this excel spreadsheet crated during litigation at a trial in this matter, but Dadoun refuses to supply *what bank records he during litigation to create it*.

- Any reconciliation files that Dadoun used to create the excel spreadsheet(s) pertaining to monies missing. *Id.* at p. 322:8-19.

- Plaintiff Iturriaga's weekely reconciliation reports. *Id.* at p.328:2-9.

- Attachments referenced to in the July 27, 2015 email. *Id.* at p. 381:1-23.

- Any information that was given to the Department of Labor in September or October of 2015 in connection with any investigation into an employee wage complaint, including any emails exchanged with investigators or emails by Dadoun to other employees respecting the complaint. *Id.* at pp. 392:19-393:-4.

- Documentation that was forwarded to "donotdelete@seldatinc.com" in Dadoun's attempt to purpotedly back up or retrieve information he believed Plaintiffs had deleted on their computers. *Id.* at pp. 400:14-401:3.

**RELIEF SOUGHT**

Plaintiffs provide herewith an attached proposed Order outlining the relief sought by this Honorable Court. It would be impossible for Plaintiffs to properly pursue a formal spoliation motion with the District Court and accompanying requests for adverse inferences at trial without exhausting preservation and spoliation discovery as outlined in the attached proposed Order.

Respectfully Submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s Christine E. Burke*

Christine E. Burke, Esq.
*Partner* .

Cc: Patrick D. Tobia (via ECF)